[No. C042832. Third Dist. Aug. 25, 2004.]

WILLIAM F. COLLINS et al., Plaintiffs and Appellants, v.
STATE OF CALIFORNIA et al., Defendants and Respondents.

COUNSEL

Law Offices of Tony J. Tanke and Tony J. Tanke for Plaintiffs and Appellants.

Law Offices of Joseph Carcione, Jr., Joseph W. Carcione, Jr., Gerald K. Okimoto, Stephen J. Purtill and Gary W. Dolinski for Plaintiff and Appellant William F. Collins.

The Drivon Law Firm and Laurence E. Drivon for Plaintiff and Appellant Barbara Y. Collins.

Jay-Allen Eisen Law Corporation, Jay-Allen Eisen; C. Athena Roussos; Harrington, Foxx, Dubrow & Canter and David H. Canter for Defendant and Respondent International Truck and Engine Corporation.

Kroloff, Belcher, Smart, Perry & Christopherson and Thomas O. Perry for Defendant and Respondent Navistar International Corporation.

Robinson & Wood, Inc., and Helen E. Williams for Defendant and Respondent Reclamation District No. 828.

OPINION

**ROBIE, J.**— In this personal injury case, plaintiff William F. Collins was represented by the Law Offices of Joseph W. Carcione, Jr. One of the lawyers from Carcione's firm, Steve Purtill, hired Carl C. Clark, Ph.D., as an expert witness on the subject matter of windshields. Unbeknownst to Purtill, a year earlier, counsel for two defendants hired Dr. Clark as a consultant for his clients on the same subject matter. After Purtill disclosed Dr. Clark as a retained expert witness, the trial court granted the defendants' motion to disqualify Collins's counsel. Collins and his wife, Barbara, appeal this order and the subsequent order denying their motion for reconsideration.

██ Disqualification of opposing counsel is authorized by the court's power to control the ministerial officers before it and may be justified to protect an opposing party from the unfair use of confidential information against that party. Here, however, disqualification of the Carcione law firm was unwarranted. That firm had no notice of Dr. Clark's dual status until defense counsel raised the issue because Dr. Clark never disclosed his dual retention. Further, the Carcione firm ceased all direct contact with Dr. Clark after his dual role was revealed. Most importantly, the undisputed evidence demonstrates that no confidential information originating with defendants or their attorneys was transmitted by Dr. Clark to the Carcione firm. We shall reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

### I

### *Underlying Facts*

Plaintiff William Collins was driving his big rig truck northbound on Interstate 5 in the early morning hours of December 4, 1997. Collins alleges a 15-year-old boy threw a two-pound piece of concrete into oncoming traffic. The concrete pierced the windshield of the cab of his truck, slammed into his head, and caused serious injuries.

William and Barbara Collins sued a number of public and private defendants.[1] As relevant here, the Collinses sued the manufacturers of the truck, Navistar International Corporation and International Truck and Engine Corporation (collectively Navistar). The Collinses alleged a cause of action against Navistar for products liability alleging theories of strict liability, negligence, and breach of warranty. The Collinses alleged Navistar defectively designed the windshield of the truck in that it "failed to provide adequate penetration resistance and/or deflection to external objects."

### II

### *Navistar's Counsel Retains Dr. Clark*

In August[2] 1999, Craig Sears, counsel for Navistar, contacted Dr. Carl C. Clark and "discussed the instant lawsuit at length." In response, Dr. Clark told Sears the terms under which he would agree to be a consultant for Navistar. On August 16, 1999, Sears received a letter from Dr. Clark outlining his qualifications and initial opinions regarding the incident.

On August 31, Dr. Clark formally agreed to act as a consultant for Navistar in exchange for a cash retainer and a confidentiality agreement. During a telephone conversation in which Dr. Clark agreed to this, Sears and Dr. Clark "candidly discussed aspects of this case, and [Dr.] Clark relayed his initial opinions regarding the incident in question." That day, Sears forwarded an engagement letter and retainer check in the amount of $2,500 to Dr. Clark.

---

[1] Both plaintiffs were originally represented by the Law Offices of Joseph Carcione, Jr. Barbara Collins, however, is currently represented by Laurence E. Drivon of the law firm Drivon & Tabak. On appeal, both William and Barbara Collins are represented by Tony J. Tanke of the Law Offices of Tony J. Tanke.

[2] Sears's declaration states that this contact occurred in September 1999, but it appears clear from the chronology that this contact was in August.

That letter stated in part, "we would not anticipate that you would be a testifying expert, but would be as a consultant to the client and specifically to this law firm as far as our preparation of this matter is concerned." The engagement letter also informed Dr. Clark he should not disclose his engagement to anyone.

The next day, Sears "spoke with [Dr.] Clark by telephone regarding this case and forwarded documents for [Dr.] Clark's review to assist him in his analysis of this case." The cover letter indicates that the only document forwarded to Dr. Clark was the police report for the accident. That letter proposed to send unspecified photographs as well.

Sears reported the next conversation he had with Dr. Clark occurred on March 12, 2002, almost two and one-half years later. In that conversation, Sears "again spoke with [Dr.] Clark by telephone to ask his opinion regarding issues that had arisen in this case. [Dr.] Clark provided his expert opinions to [Sears] during that conversation."

In describing his communications with Dr. Clark, Sears asserted, "I spoke very candidly [with Dr. Clark] about the defense positions, and [Dr.] Clark provided his expert opinions regarding the glass windshield and other issues. [International] and [Navistar] used confidential information provided by [Dr.] Clark to plan discovery and discovery responses, retain other consultants and plan trial strategy."

### III

#### Collinses' Lawyer Retains Dr. Clark

On September 27, 2000, one of the attorneys representing William Collins, Stephen Purtill, contacted Dr. Clark about the possibility of retaining him as an expert witness. Dr. Clark agreed to be an expert witness for the Collinses. Dr. Clark never told Purtill that Navistar's counsel had previously retained him as a consultant in the same case. Further, Purtill declared that in his conversations with Dr. Clark, Dr. Clark did not reveal any information "that could possibly be considered privileged regarding his dealings with the Navistar defendants or their attorneys." The only information Dr. Clark provided to Purtill was "his opinion regarding whether a glass-plastic windshield would have prevented the concrete from entering William Collins's truck, and information relating to his experience at NHTSA[3] during the period that FMVSS[4] 205 was being amended to allow the use of glass plastic."

---

[3] National Highway Traffic Safety Administration.
[4] Federal Motor Vehicle Safety Standards.

## IV

*Purtill Discloses Dr. Clark as Expert*

On June 10, 2002, Purtill disclosed Dr. Clark as one of the 26 expert witnesses retained on behalf of the Collinses. Purtill also designated 52 "nonretained" expert witnesses.

When Sears reviewed the expert witness disclosure, he spoke with Dr. Clark on June 10 and 13, 2002. In those conversations, Dr. Clark told Sears that he had "previously agreed to consult with [Navistar] and had received the retainer."

Shortly after the expert disclosure, Dr. Clark called Purtill and told him that he had been retained by an attorney from Los Angeles and that he had completely forgotten about it. According to Purtill, Dr. Clark said he "had not remembered that he had talked with Navistar's counsel until June of this year when defense counsel Craig Sears called him up to tell him that he had been disclosed as plaintiff's [*sic*] expert." Purtill asserted "[Dr.] Clark said the initial contact with Mr. Sears had been very brief and that very little was discussed, and he had not heard from Mr. Sears since 1999 prior to the June, 2002, telephone call." Dr. Clark reported to Purtill he received a police report and forwarded a letter to Sears "stating his opinion in this case." Purtill told Dr. Clark he could have no further contact with him until the matter was sorted out.

Sears sent correspondence to Purtill on June 18, June 24, and July 15. The first letter informed Purtill of Navistar's prior engagement of Dr. Clark as a confidential consultant and demanded that he withdraw Dr. Clark as an expert. The second letter repeated this demand and further requested that Purtill and his office recuse themselves from the case.

The Carcione firm responded to the second letter by asking Navistar's counsel to verify that Navistar had previously retained Dr. Clark and imparted confidential information to him.

In Sears's third letter, he advised counsel of the chronology of contacts between Navistar's counsel and Dr. Clark, beginning in August 1999. Generally, Sears stated he had discussed "the nature of the case, and defense theories and thinking with respect to the windshield issues herein. [Dr.] Clark and I discussed the potential plaintiff and defense theories of the case at that time, and he agreed to act as a consultant to [Sears's] office, although he did not agree to be a trial expert, insofar as he was apparently winding down his practice." Further, Sears stated that he "discussed defense strategy with

respect to windshield issues and anticipated plaintiffs' theories of the case." Finally, Sears told the Carcione firm that he had utilized "information and ideas which helped [him] conduct discovery and which [he] shared with other consultants retained by the defendant."

V

*Motion for Disqualification*

Navistar filed a motion to disqualify William Collins's counsel on July 29, 2002. The basis for the motion was that Purtill "wrongfully communicated with [Dr.] Clark" and refused to withdraw him as an expert witness despite several requests.

In support of that motion, Sears set forth in his declaration the contacts he had with Dr. Clark as outlined above. In terms of confidential information, Sears averred he: (1) "discussed the instant lawsuit [with Dr. Clark] at length"; (2) received Dr. Clark's "initial opinions regarding the incident"; (3) "candidly discussed aspects of this case, and [Dr.] Clark relayed his initial opinions regarding the incident"; (4) "spoke with [Dr.] Clark by telephone regarding this case and forwarded documents for [Dr.] Clark's review to assist him in his analysis of this case"; (5) asked Dr. Clark's "opinion regarding issues that had arisen in this case. [Dr.] Clark provided his expert opinions to [him]"; and (6) "spoke very candidly [with Dr. Clark] about the defense positions, and [Dr.] Clark provided his expert opinions regarding the glass windshield and other issues." Sears also declared that Dr. Clark never informed him he was speaking with the attorneys representing William Collins regarding this case. Conspicuously absent from the moving papers is a declaration from Dr. Clark as to the nature of the information he received from Sears, as well as the information he provided to Purtill.

In its opposition to this motion, the Carcione firm accused the defense lawyers of "gamesmanship," suggesting that impermissible ulterior motives were behind this motion. On the merits, the Carcione firm argued Navistar failed to demonstrate that defendants imparted confidential information to Dr. Clark and thus could not prevail on the recusal motion. The Carcione firm also suggested that William Collins would be unable to find other counsel to assist him because of the complexity of the case and the size of its potential lien for fees on any judgment.[5] The Carcione firm further argued Navistar had engaged in the impermissible tactic of suppressing the testimony of Dr. Clark,

---

[5] This argument was supported by Purtill's declaration that his firm had spent between $300,000 and $500,000 in out-of-pocket costs on this case and would assert a lien against the case for $1.5 million if it was recused. He stated that the file in this case consisted of 901 documents filling 75 files. It was Purtill's opinion that no other attorney would take this case given its complexity and the enormous attorney fee lien the Carcione firm would assert against the case. Another attorney, Tony Tanke, seconded Purtill's opinion on this issue.

a leading expert on glass-plastic, by retaining him without any intent of using him.[6]

In his declaration in opposition to the motion for recusal, Purtill stated Dr. Clark never revealed to Purtill that he had been previously retained by Navistar. Purtill also stated he had not received any confidential information from Dr. Clark that could have been derived from Navistar or Navistar's counsel. Purtill further alleged that when the dual representation came to light, Purtill informed Dr. Clark that he could not have further contact with him until the court sorted the matter out.

On August 30, 2002, the matter came on for hearing. On October 8, 2002, the trial court granted the motion and disqualified Dr. Clark as a witness and Purtill's law firm—the Law Offices of Joseph W. Carcione, Jr.—as counsel for William Collins.

## VI

### *Motion for Reconsideration*

William Collins brought a motion for reconsideration on October 18, 2002. William Collins's attorneys argued they were unable to present the evidence from Dr. Clark in response to the initial motion because they terminated all communication with Dr. Clark once the issue of his dual retention came to light.

At the time it filed the motion for reconsideration, the Carcione firm was engaged in an attempt to secure Dr. Clark's deposition. Navistar objected to the deposition notice and moved to quash William Collins's deposition subpoena. Dr. Clark obtained independent counsel and informed both the parties he would not appear for any deposition.

In a supplemental declaration, Purtill also submitted Dr. Clark's initial letter to him in which he agreed to act as an expert witness for William Collins.

On his own, Dr. Clark submitted a declaration concerning his retention.[7] Dr. Clark declared he spoke with Purtill in September 2000 and agreed to be

---

[6] The Carcione firm further provided the declaration of another of its expert witnesses who opined that Dr. Clark was an outspoken advocate for the inclusion of glass-plastic windshields. It was that expert's opinion that defense counsel could not have retained Dr. Clark to testify on defendant's behalf at trial.

[7] Dr. Clark declared he did not have any communication with William Collins's attorneys about the preparation of this declaration.

a witness for William Collins. Dr. Clark averred, "At the time I spoke with Mr. Purtill on or about September 27, 2000, I did not realize that this was the same case for which I had previously agreed to act as a consultant (but not an expert) for Craig Sears, Esq. Because I did not realize that I had discussed the *Collins* case with Mr. Sears or any other lawyer, I am certain that I did not mention anything about any such prior contact, or any communication related to such contact, to Mr. Purtill." Dr. Clark received a letter, a check, and some documents from Purtill's office in April 2002. In the next paragraph of his declaration, Dr. Clark stated, "When I agreed to serve as an expert for the plaintiffs in the *Collins* case, I did not realize that this was the same case that I had agreed to act as a consultant for Mr. Sears, or having been contracted by any lawyer other than Mr. Purtill about this case. Because I did not realize that I had discussed the same case with Mr. Sears, I am certain that I did not mention anything about such prior contact, or any communication related to such contact, to Mr. Purtill." After his designation as an expert witness, Dr. Clark received a telephone call from Sears and then reviewed his file. As a result of his file review, he discovered he had been retained by both sides of the case. Dr. Clark then called Purtill and told Purtill that he had spoken previously with Sears about the case and Purtill told him he could not have any further contact until the court sorted the matter out.

Dr. Clark averred, "Other than is set forth in this declaration, I did not, at any time during any of my conversations with Mr. Purtill, tell him what Mr. Sears had said to me about the *Collins* case or what I told Mr. Sears about the case. I did not discuss with Mr. Purtill my involvement with Mr. Sears at all." Dr. Clark also confirmed that Purtill was the only person he spoke with at the Carcione law firm.[8]

The trial court denied the motion for reconsideration, concluding that William Collins had not produced any new facts to justify reconsideration.

William and Barbara Collins appeal.

---

[8] In the motion for reconsideration, the Carcione firm also argued the court's order was too broad in that it disqualified the entire firm as to the entire case. The firm argued disqualification should be limited to Purtill, and to the extent the firm was disqualified, that disqualification should only be as to Navistar and International, leaving the firm free to pursue other defendants on behalf of William Collins. In support of the argument for a partial recusal, the Carcione firm submitted the declarations of other attorneys in the office who purported to explain that Purtill was the only attorney in the office who had any contact with Dr. Clark.

## DISCUSSION

## I

### *Standard of Review*

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion. [Citations.] If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence. [Citations.] When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion. [Citation.] However, the trial court's discretion is limited by the applicable legal principles. [Citation.] Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.] In any event, a disqualification motion involves concerns that justify careful review of the trial court's exercise of discretion. [Citation.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1143–1144 [86 Cal.Rptr.2d 816, 980 P.2d 371].) Where there are no disputed facts, "we need not defer to a trial court's resolution of disputed facts and inferences. Instead, we are concerned with the legal significance of the undisputed facts in the record. We therefore review the trial court's exercise of its discretion as a question of law in light of the pertinent legal principles." (*Id.* at p. 1144.)

## II

### *Guiding Legal Principles*

"A motion to disqualify a party's counsel may implicate several important interests. Consequently, judges must examine these motions carefully to ensure that literalism does not deny the parties substantial justice. [Citation.] Depending on the circumstances, a disqualification motion may involve such considerations as a client's right to chosen counsel, an attorney's interest in representing a client, the financial burden on a client to replace disqualified counsel, and the possibility that tactical abuse underlies the disqualification motion." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra,* 20 Cal.4th at pp. 1144–1145.)

"A trial court's authority to disqualify an attorney derives from the power inherent in every court ' [t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.' [Citations.]

Ultimately, disqualification motions involve a conflict between the clients' right to counsel of their choice and the need to maintain ethical standards of professional responsibility. [Citation.] The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra,* 20 Cal.4th at p. 1145.)

Two reported cases come close to the issue presented here: *County of Los Angeles v. Superior Court* (1990) 222 Cal.App.3d 647 [271 Cal.Rptr. 698] (*County of Los Angeles*) and *Shadow Traffic Network v. Superior Court* (1994) 24 Cal.App.4th 1067 [29 Cal.Rptr.2d 693] (*Shadow Traffic*).

In *County of Los Angeles* , defendant county designated M. Anthony Verity, M.D., as its expert witness. (*County of Los Angeles, supra,* 222 Cal.App.3d at p. 650.) Before he was deposed, the county withdrew its designation of Dr. Verity as its expert. (*Id.* at p. 651.) The plaintiff's counsel subsequently contacted the expert and explained that because the county no longer required the expert's services, the expert was now at liberty to work for plaintiff. (*Id.* at p. 652.) Despite the expert's expressed reservations about the propriety of accepting this engagement, he met with the plaintiff's attorney, discussed the contents of a prior report he prepared for the county's attorneys and agreed to testify on the plaintiff's behalf. (*Id.* at p. 652.) The appellate court reversed the trial court's denial of the county's motion to disqualify the expert and the plaintiff's counsel. (*Id.* at pp. 658–659.)

■ The *County of Los Angeles* court concluded that protection against the unfair use of the county's confidential attorney work product required that the plaintiff's attorney be recused from further involvement in the case. (*County of Los Angeles, supra,* 222 Cal.App.3d at p. 658 .) The appellate court explained its holding as follows: "[A] party may, for tactical reasons, withdraw a previously designated expert witness, not yet deposed. If that expert continues his or her relationship with the party as a consultant, the opposing party is barred from communicating with the expert and from retaining him or her as the opposing party's expert. . . . [¶] When an attorney violates this rule, he or she must be recused. Having become privy to an opposing attorney's work product, there is no way the offending attorney could separate that knowledge from his or her preparation of the case. [¶] We are aware that a motion to disqualify can and does cause hardship to the client or clients of a disqualified attorney. '[U]ltimately the issue involves a conflict between a client's right to counsel of his choice and the need to maintain ethical standards of professional responsibility. "The preservation of public trust both in the scrupulous administration of justice and in the

integrity of the bar is paramount. . . . [The client's recognizably important right to counsel of his choice] must yield, however,' to considerations of ethics which run to the very integrity of our judicial process." [Citation.]' [Citation.]" (*Id.* at pp. 657–658.) The report the expert discussed with the plaintiff's counsel constituted confidential attorney work product which was improperly revealed to the plaintiff's counsel; thus recusal was necessary. (*Id.* at p. 655.) The court noted that the expert's expressed reservations about taking the new engagement along with the plaintiff's counsel's knowledge of the doctor's relationship with the county should have prompted counsel "to communicate with the County in order to clarify the situation." (*Id.* at p. 657.) Thus, recusal was proper. (*Id.* at pp. 658–659.)

In *Shadow Traffic*, Metro Traffic Control (Metro) was a competitor of defendant, Shadow Traffic Network (Shadow Traffic) in the business of traffic reporting. (*Shadow Traffic, supra*, 24 Cal.App.4th at p. 1071.) Metro sued Shadow Traffic, alleging it was engaging in various business torts. (*Id.* at p. 1071.) Attorneys for Metro interviewed members of the accounting firm of Deloitte & Touche (accountants) to discuss their retention as expert witnesses on the complex subject of damages. (*Id.* at pp. 1071–1073.) During their initial meeting, Metro's counsel informed the accountants that the conversation was confidential. (*Id.* at p. 1073.) Metro's attorneys then extensively discussed their client's litigation and trial strategies, theories and legal analysis, and how the accountants could assist them. (*Ibid.*) Ultimately, Metro's counsel declined to retain the accountants. (*Id.* at p. 1072.)

A few weeks later, attorneys for Shadow Traffic interviewed two of the same accountants. (*Shadow Traffic, supra,* 24 Cal.App.4th at pp. 1072, 1074.) The accountants told the Shadow Traffic attorneys that Metro's attorneys had met with them to retain them for the identical issues, but had decided not to retain them. (*Id.* at p. 1072.) Despite this warning, Shadow Traffic's attorneys spoke briefly with the accountants about the manner in which they expected Metro to attempt to calculate its damages. (*Id.* at p. 1074.) Shadow Traffic's attorneys then retained the accountants as their expert witnesses and disclosed them to Metro as their expert witnesses. (*Id.* at p. 1072.)

After Shadow Traffic disclosed the accountants, Metro brought a motion to recuse Shadow Traffic's attorneys. (*Shadow Traffic, supra,* 24 Cal.App.4th at p. 1072.) The trial court granted Metro's motion and denied Shadow Traffic's subsequent motion for reconsideration. (*Id.* at pp. 1075–1077.) The appellate court affirmed. (*Id.* at p. 1089.)

The appellate court rejected Shadow Traffic's initial argument that the information Metro's attorneys disclosed to the accountants "was not confidential as a matter of law because Metro subsequently decided not to retain

Deloitte & Touche as an expert witness." (*Shadow Traffic, supra,* 24 Cal.App.4th at p. 1078.) The court explained any confidential information transmitted from Metro to the accountants via Metro's lawyers fell within the rubric of the attorney-client privilege. (*Id.* at pp. 1078–1079.) Separately, reports prepared by the experts and the attorney's impressions and conclusions fall within the protection of the attorney-work-product rule. (*Ibid.*) The court held that, "communications made to a potential expert in a retention interview can be considered confidential and therefore subject to protection from subsequent disclosure even if the expert is not thereafter retained as long as there was a reasonable expectation of such confidentiality." (*Id.* at p. 1080.) The court concluded that substantial evidence supported the trial court's conclusion that conversations between Metro and the accountants met this test. (*Id.* at pp. 1083–1084.)

In determining whether the court was required to recuse Shadow Traffic's attorneys, the court articulated the following test: " 'The party seeking disqualification must show that its present or past attorney's former employee possesses confidential attorney-client information materially related to the proceedings before the court. [Fn. omitted.] The party should not be required to disclose the actual information contended to be confidential. However, the court should be provided with the nature of the information and its material relationship to the proceeding. [Citation.] [¶] Once this showing has been made, a rebuttable presumption arises that the information has been used or disclosed in the current employment.' " (*Shadow Traffic, supra,* 24 Cal.App.4th at pp. 1084–1085.) The court explained that this test was necessary "to implement the important public policy of protecting against the disclosure of confidential information and the potential exploitation of such information by an adversary." (*Id.* at p. 1085.) The court concluded that the Shadow Traffic attorneys failed to rebut the presumption that the accountants had deliberately or inadvertently passed along the information they had received from Metro's attorneys and the recusal order must stand. (*Id.* at pp. 1085–1087.)

The lesson to be drawn from these cases is the courts, in order to protect client confidences delivered to and from experts, have the power and obligation to disqualify attorneys who knowingly hire opposing counsel's expert witnesses. This rule is based on the premise that "protecting the confidentiality of communications between attorney and client is fundamental to our legal system. The attorney-client privilege is a hallmark of our jurisprudence that furthers the public policy of ensuring ' "the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense." [Citation.]' [Citation.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc., supra,* 20 Cal.4th at p. 1146.) This same policy governs the attorney work product possessed and

generated by these expert witnesses. (*Shadow Traffic, supra,* 24 Cal.App.4th at p. 1085; *County of Los Angeles, supra,* 222 Cal.App.3d at p. 658.) As we shall demonstrate below, these cases do not end the inquiry here.

## III

### *Application of Shadow Traffic*

Here, the trial court relied heavily on *Shadow Traffic* in making its ruling. The Collinses attack the trial court's ruling on three separate grounds. First, the Collinses contend the evidence fails to demonstrate that Navistar provided confidential information to Dr. Clark. Second, they contend the *Shadow Traffic* rebuttable presumption should not apply in this case because Navistar retained access to the expert witness and they could not ethically speak with the expert. Third, the Carcione firm "decisively rebutt[ed] the presumption." While we reject their initial claim, we agree with the second argument. We further conclude the undisputed evidence establishes that no material confidential information was disclosed to the Carcione firm via Dr. Clark and thus disqualification was improvidently granted here.

### A

### *Conveyance of Confidential Information from Navistar to Dr. Clark*

We start with the question of whether Navistar demonstrated the disclosure of material confidential information to Dr. Clark. As we have already described, the moving party " 'should not be required to disclose the actual information contended to be confidential. However, the court should be provided with the nature of the information and its material relationship to the proceeding.' " (*Shadow Traffic, supra,* 24 Cal.App.4th at p. 1085.) The attorneys in *Shadow Traffic* satisfied that burden by submitting declarations that stated, " 'During this meeting, Ms. Langs and I extensively discussed our litigation and trial strategies, our theories and legal analysis of this litigation, what assistance we desired from Deloitte & Touche to help us prepare for trial, how we expected the expert testimony to fit in at trial, and what charts and graphs we wanted them to prepare. The Deloitte & Touche representatives fully participated in the discussion, and indeed offered several suggestions and comments on our strategy.' " (*Id.* at p. 1073, italics omitted.) The court concluded this description of the confidential information was sufficient to establish the exchange of protected confidential information between Metro's attorneys and the accountant experts. (*Id.* at p. 1084.) In the words of the court, the "factual and legal theories about the case" were "matters traditionally considered confidential." (*Id.* at pp. 1083–1084.)

Similarly, in *Western Digital Corp. v. Superior Court* (1998) 60 Cal.App.4th 1471, 1481 [71 Cal.Rptr.2d 179], the court concluded the moving party had demonstrated the communication of confidential information when it submitted a declaration in which an attorney stated, " '[I] initially provided [the expert] with my views of the progress of the litigation, my evaluation of the strengths and weaknesses of our liability case, my prognosis for the remainder of the case and my analysis of the strengths and weaknesses of the damage issues as I expected them to eventually be litigated, as well as the items of damages I thought to be recoverable.' "

Similarly here, Navistar's attorney declared he: (1) "discussed the instant lawsuit [with Dr. Clark] at length"; (2) received Dr. Clark's "initial opinions regarding the incident"; (3) "candidly discussed aspects of this case, and [Dr.] Clark relayed his initial opinions regarding the incident"; (4) "spoke with [Dr.] Clark by telephone regarding this case and forwarded documents for [Dr.] Clark's review to assist him in his analysis of this case"; (5) "ask[ed] [Dr. Clark's] opinion regarding issues that had arisen in this case. [Dr.] Clark provided his expert opinions to [him]"; and (6) "spoke very candidly [with Dr. Clark] about the defense positions, and [Dr.] Clark provided his expert opinions regarding the glass windshield and other issues." The trial court's implied conclusion that confidential attorney-work-product information was exchanged with Dr. Clark is therefore supported by substantial evidence.

B

*The Rebuttable Presumption Does Not Apply*

We agree with the Collinses that the rebuttable presumption created by *Shadow Traffic, supra,* 24 Cal.App.4th 1067, has no application to the particular facts of this case. Our conclusion is based upon the fact that the expert witness in this case, Dr. Clark, remained the consultant to Navistar. It is further bolstered by the ethical conduct of William Collins's counsel once the conflict was disclosed.

Under the *Shadow Traffic* case, a rebuttable presumption arises—once confidential information has been shared with an expert—that the same information has been used by or disclosed to the subsequent employer. (*Shadow Traffic, supra*, 24 Cal.App.4th at p. 1084.) "As the purpose of this presumption is to implement the public policy of protecting confidential communications, the presumption is one affecting the burden of proof. (Evid. Code, § 605.) The effect of this type of presumption 'is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact.' (Evid. Code, § 606.)" (*Shadow Traffic*, at p. 1085 .) Thus,

under this presumption, once the trial court had first found the basic fact that gave rise to the presumption—the disclosure of confidential communication between Navistar's counsel and Dr. Clark—it had to find the presumed fact—Dr. Clark disclosed this information to Purtill—unless it was persuaded by a preponderance of the evidence of the nonexistence of the presumed fact. (*Ibid.*) As explained by *Shadow Traffic,* the shifting of the burden of proof to the opposing party " 'is a rule by necessity because the party seeking disqualification will be at a loss to prove what is known by the adversary's attorneys and legal staff. [Citation.]' [Citation.]" (*Id.* at p. 1085.) When the expert has gone to the other side and is no longer available to the side that originally retained him, the shifting of the burden of proof makes eminent sense.

Here, however, we conclude the rebuttable presumption should not apply. At all times, the expert witness, Dr. Clark, remained a consultant for Navistar's counsel. At the time defendants filed their moving papers, Navistar's counsel averred that Dr. Clark was still in the employ of his clients. Further, Navistar's counsel provided no facts suggesting that Dr. Clark was no longer available to him for purposes of presenting evidence in favor of the motion. Indeed, Sears's declaration states explicitly that Dr. Clark spoke to him twice on the telephone and confirmed his original retention by Navistar. The most important source of the information from which to ascertain whether Dr. Clark had passed on any confidential information to Purtill thus remained in Navistar's hands.

Under these circumstances, the reason for shifting the burden of proof to the opposing party does not exist. We conclude the normal burdens of proof, wherein the party moving for relief must establish its right to it, is appropriate.[9]

█ Thus, we conclude where the expert has remained under the control of the moving party, and there is no evidence counsel knowingly retained the opposing party's expert or that the expert intentionally advised both sides, the *Shadow Traffic* rebuttable presumption does not apply. In this case, the moving party has the burden of proving that the confidential information it imparted to its expert witness has been transmitted to the opposing party.

---

[9] We express no opinion as to whether the burden of proof should shift where the expert is no longer communicating with the party that originally retained him.

## C

### *The Undisputed Evidence Demonstrates Dr. Clark Disclosed No Confidential Information to Purtill*

Conspicuously absent from the moving papers in this case was a declaration from Dr. Clark in which he might have indicated to the court that he had disclosed Navistar's material confidential information to Purtill. The only evidence supplied by defendants was Sears's declaration in which he stated he provided nonprivileged documents (the police report) and privileged attorney work product in the form of his evaluation of the case.

On this record, there is not the slightest hint that Dr. Clark disclosed a secret attorney-client communication from Navistar to its attorney about the windshields of its trucks. Dr. Clark did not suggest that he received or disclosed confidential documents about the windshields that might have been generated by another expert hired by Navistar's attorney or that might have been produced as a result of the attorney's inquiry of his client. The absence of this declaration raises a huge red flag against granting the motion to recuse in light of Sears's sworn declaration that Dr. Clark is still Navistar's consultant.

On the other hand, the uncontradicted evidence in this case from Purtill was that he did not know that Dr. Clark had been previously retained by Navistar until after he disclosed this witness and defense counsel notified him of the conflict.

Importantly, Purtill swore under penalty of perjury that Dr. Clark had not disclosed anything to him that constituted confidential information from Navistar's counsel. We also stress that Purtill's testimony was independently confirmed by Dr. Clark. Dr. Clark declared, essentially, that he forgot he had spoken with anyone else about this case and therefore he could not have disclosed any information to Purtill about what he learned from the other side.[10]

In light of this uncontradicted evidence, we conclude that Navistar failed to demonstrate its confidential attorney work product was transmitted from

---

[10] We note this declaration was not submitted by the Collinses in response to the original motion. In light of the inadvertent nature of the Carcione firm's conduct in this case, however, we understand the firm's "hands off" approach to this expert once the conflict was discovered. This provides a satisfactory reason why this evidence was not produced in response to the original motion and constituted new facts for the motion for reconsideration. (Code Civ. Proc., § 1008, subd. (a); *McPherson v. City of Manhattan Beach* (2000) 78 Cal.App.4th 1252, 1265 [93 Cal.Rptr.2d 725].) We further conclude nothing untoward appears from the Carcione firm's later contacts with the expert via letter or subpoena after the motion for recusal had been granted.

Dr. Clark to counsel for William Collins. The trial court's recusal order cannot stand based on this undisputed testimony.

■ We also conclude recusal is an inappropriate remedy in this case because the Carcione firm was innocent of wrongdoing when it hired Dr. Clark and acted ethically after this issue was discovered. In both *County of Los Angeles* and *Shadow Traffic,* the courts stressed that counsel could have avoided the recusal issue entirely by a simple telephone call to opposing counsel or an appropriate application to the court prior to speaking with the expert. (*County of Los Angeles, supra,* 222 Cal.App.3d at p. 657; *Shadow Traffic, supra,* 24 Cal.App.4th at p. 1088.) Unlike the lawyers in those cases, here, the Carcione firm had no prior notice of the conflict of interest minefield it walked into until defense counsel informed it of the problem. It was simply impossible for the Carcione firm to call opposing counsel to determine if it was acceptable for the Carcione firm to hire Dr. Clark because it did not know that defendants had already hired Dr. Clark.

" 'Mere exposure to the confidences of an adversary does not, standing alone, warrant disqualification. Protecting the integrity of judicial proceedings does not require so draconian a rule. Such a rule would nullify a party's right to representation by chosen counsel any time *inadvertence* or devious design put an adversary's confidences in an attorney's mailbox. Nonetheless, we consider the means and sources of breaches of attorney-client confidentiality to be important considerations.' [Citation.]" (*State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644, 657 [82 Cal.Rptr.2d 799], italics added.)

"When a lawyer who receives materials that obviously appear to be subject to an attorney-client privilege or otherwise clearly appear to be confidential and privileged and where it is reasonably apparent that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged. The parties may then proceed to resolve the situation by agreement or may resort to the court for guidance with the benefit of protective orders and other judicial intervention as may be justified. We do, however, hold that whenever a lawyer ascertains that he or she may have privileged attorney-client material that was inadvertently provided by another, that lawyer must notify the party entitled to the privilege of that fact. [¶] [H]aving so noted, however, we do not rule out the possibility that in an appropriate case, disqualification might be justified if an attorney inadvertently receives confidential materials and fails to conduct himself or herself in the manner specified above, assuming other factors compel disqualification." (*State Comp. Ins. Fund v. WPS, Inc., supra,* 70 Cal.App.4th at pp. 656–657.)

 Here, the conduct of the Carcione firm met the standards imposed by *State Comp. Ins. Fund v. WPS, Inc.*, *supra*, 70 Cal.App.4th at pages 656–657. Once the Carcione firm discovered that it had inadvertently retained the same expert, it was duty bound to refrain from talking directly with that expert until the court resolved the problem. The firm did exactly that.

 Given that the undisputed evidence is that the Carcione firm received no privileged information from Dr. Clark, and that it acted with high ethical standards after the problem of the dual retention of Dr. Clark was disclosed, we conclude recusal of the Carcione firm in this case was an abuse of the trial court's discretion. There is nothing in this record that demonstrates that recusal is necessary to "preserve public trust in the scrupulous administration of justice and the integrity of the bar." (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.*, *supra*, 20 Cal.4th at p. 1145.) Thus, William Collins's "important right to counsel of [his] choice" should not have been taken from him. (*Ibid.*)

## DISPOSITION

The judgment (order of recusal) is reversed. The Collinses shall recover costs on appeal. (Cal. Rules of Court, rule 27(a).)

Blease, Acting P. J., and Hull, J., concurred.

A petition for a rehearing was denied September 15, 2004, and the petition of respondents International Truck and Engine Corporation and Navistar International Corporation for review by the Supreme Court was denied December 1, 2004.