Filed 10/21/24  Via Appia v. OP Development CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VIA APPIA, LLC, | F087160 |
| Plaintiff and Appellant, | (Super. Ct. No. CVCV15-0010684) |
| v. | |
| OP DEVELOPMENT, INC., et al., | **OPINION** |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Mariposa County.  Michael A. Fagalde, Judge.

The Ware Practice Group, Mindy L. Ware and James Ware for Plaintiff and Appellant.

Wanger Jones Helsley, Amanda G. Hebesha, Patrick D. Toole, John P. Kinsey and Kathleen D. DeVaney for Defendants and Respondents.

-ooOoo-

This appeal challenges an order disqualifying a law firm from further involvement in a pending civil action.  The facts resemble those in *Shadow Traffic Network v. Superior Court* (1994) 24 Cal.App.4th 1067 (*Shadow Traffic*), which the trial court relied upon in making its ruling.  The *Shadow Traffic* opinion provides a framework for

deciding attorney disqualification motions in a scenario where opposing parties have both discussed their case with an expert who, as a result of those discussions, may have imparted confidential information about one party to the other.

Via Appia, LLC (plaintiff) retained a certain expert witness despite prior objections by OP Development, Inc., and Gregory J. Opinski (defendants). Defense counsel informed plaintiff's counsel in writing of their earlier contact with the expert and claimed to have revealed to the expert "confidential information concerning this case." Undeterred, plaintiff moved forward with designating the expert in formal pretrial disclosures. Defendants responded with a motion to disqualify the expert and plaintiff's counsel.

Under *Shadow Traffic*, the party seeking disqualification has an initial burden to show it revealed to the expert "confidential information materially related to [the] pending litigation." (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1084.) "'Once this showing has been made, a rebuttable presumption arises that the information has been [disclosed by the expert to the opposing party's legal counsel].'" (*Id*. at p. 1085.) Here, the trial court found (1) defendants met their initial burden; (2) disclosure of confidential information by the expert to plaintiff's counsel presumably occurred; and (3) plaintiff failed to rebut the presumption. We affirm the disqualification order.

## FACTUAL AND PROCEDURAL BACKGROUND

To provide a contextual background, we take judicial notice, sua sponte, of our records in *Via Appia*, *LLC v. OP Development*, *Inc*., F084595, and *Via Appia*, *LLC v. Marcus & Millichap Real Estate Investment Services*, *Inc.*, F080496 and F081598. (Evid. Code, §§ 452, subd. (d), 459, subd. (a); see *ZF Micro Devices*, *Inc. v. TAT Capital Partners*, *Ltd*. (2016) 5 Cal.App.5th 69, 73, fn. 3.)

Plaintiff and one of the defendants are/were co-owners of a large parcel of land (over 780 acres in size) in Mariposa County. A failed effort to market and sell the property led to a partition action, which plaintiff filed in August 2015. The pleadings

2.

were amended several times to add tort claims against defendants and additional parties not involved in this appeal.

Plaintiff has been represented by four different law firms since the filing of its original complaint. The Oakhurst-based firm of Jamison & Chappel served as its attorneys of record from August 2015 to August 2016. A San Francisco law firm, Peterson Martin & Reynolds LLP, substituted into the case in August 2016 and stayed on until approximately May 2019. Another Bay Area firm, Newmeyer & Dillion LLP, served as plaintiff's counsel from May 2019 until April 2023. Since the withdrawal of Newmeyer & Dillion, plaintiff has been represented by attorneys James Ware and Mindy Ware of the Ware Practice Group in Pleasanton.[1]

In January 2019, defendants' attorneys met with a real estate appraiser, Rick P. Smith (the expert), about hiring him as a consultant and possibly designating him as a retained expert witness. The meeting lasted approximately 90 minutes. At the time of this meeting, there was a trial date of April 9, 2019. Soon afterward, however, the trial date was vacated due to a motion by plaintiff to file a third amended complaint.

Plaintiff's motion to amend was granted, and the operative pleading was filed in March 2019. Six months later, the trial court ordered bifurcation of the partition claim. "Phase 1" of the trial was scheduled for January 2020.

In October 2019, defense counsel met with the expert again. This meeting also lasted approximately 90 minutes. It is unclear whether any type of formal agreement was reached, but the attorneys and the expert subsequently corresponded about setting up a meeting between the expert and defendant Gregory Opinski to "walk the subject property" together. A few weeks later, in November 2019, the expert reportedly

---

[1]There was an overlap in representation during 2022 and 2023 while the case was on appeal in F080496, F081598, and F084595. The Ware Practice Group first associated into the case as coappellate counsel on July 26, 2022.

informed defense counsel that, due to his busy schedule and the nearing trial date, he was unable to perform any further work on the case.

The January 2020 trial date was ultimately vacated and continued several more times for various reasons. Phase 1 of the trial finally commenced in December 2021 and concluded in January 2022. In May 2022, the trial court entered an interlocutory judgment of partition by sale. The second phase of trial was scheduled to begin on December 5, 2023.

On September 21, 2023, plaintiff's attorney Mindy Ware sent an e-mail to defense attorney Amanda Hebesha. The body of the message was as follows:

> "We are approaching the deadline for disclosure of expert witnesses. We intend to disclose [the expert], an MAI Appraiser as an expert witness to be called during Via Appia's case in chief. [The expert] disclosed to us that several years ago, your firm considered retaining him as an expert, but did not do so. Our understanding is that he received no confidential information during his interview with your firm. We ask you to notify us by Tuesday, September 26, if you have any objection to our disclosure of [the expert] as an expert witness in this case."

Attorney Hebesha quickly responded with a message that said, "We do object. He did receive confidential information concerning this case. I met with him and spoke with him at length about the case. I think we even exchanged emails which would be privileged."

Plaintiff's counsel waited nearly a week before replying to attorney Hebesha. In a message dated September 27, 2023, attorney Mindy Ware wrote, "We acknowledge your response and will confer with our client on how to proceed." Defense counsel heard nothing further on the matter until October 16, 2023, when they were served with plaintiff's expert disclosures pursuant to Code of Civil Procedure section 2034.260. Plaintiff declared its retention of the expert to testify "to the economics of real property ownership, and injury, loss, damage or harm that an owner can suffer based on the conduct of a co-owner and real estate professionals."

4.

Defendants moved to disqualify both the expert and plaintiff's counsel. A request for the motion to be heard on shortened time was granted. The motion was argued and decided on November 3, 2023. This timely appeal followed. (See Code Civ. Proc., § 904.1, subd. (a)(6); *Reed v. Superior Court* (2001) 92 Cal.App.4th 448, 454–455 [attorney disqualification orders are construed as injunctions immediately reviewable by direct appeal or petition for writ of mandamus].)

***Defendants' Evidence***

Defendants' motion was supported by sworn declarations from their lead counsel, attorneys Hebesha and Patrick Toole. Their version of events was as follows. Because plaintiff made no objections to the evidence, this summary ignores any arguable hearsay issues.

In December 2018, defense counsel made initial contact with the expert through an associate attorney with the surname Neal. The law firm had retained the expert on "many occasions," and the associate was instructed to "reach out" to him about possibly serving as a "consulting expert" in this case. Arrangements were made for the expert to meet with Neal and attorney Hebesha on January 15, 2019. The meeting took place as scheduled, in Hebesha's office, and it lasted approximately 90 minutes.

During the January 2019 meeting, defense counsel and the expert "discussed his retention as a consultant with the thought process that he would likely be formally designated as an expert [witness]." As the meeting progressed, attorney Hebesha realized the expert could provide advice and assistance with multiple aspects of the case. She "discussed the case and [defendants'] positions in detail," divulging her own "thoughts and theories" on various claims and defenses. Hebesha's declaration goes into further detail on the topic of "confidential information," making clear she revealed "trial strategy and other attorney work product" to the expert with the expectation of confidentiality.

Two days later, the expert e-mailed defense counsel and "indicated he had already started pulling information relevant to his work on this case and asked that [they] send

him additional information." This occurred shortly before the April 2019 trial date was vacated. Attorney Hebesha's declaration implies that the expert's work on the case was put on hold because of a delay in resetting the trial.

In October 2019, after Phase 1 of trial had been set for January 2020, attorney Hebesha "reached back out to [the expert] to set another trial strategy conference." They met in person on October 16, 2019, and the meeting lasted approximately 90 minutes. Attorney Patrick Toole also participated in this meeting. The attorneys shared their "theories and views" on various claims and defenses, and also divulged "trial strategy and other work product." The expert "fully participated in the discussion, and offered several suggestions and comments about [defendants'] trial strategy."

On November 11, 2019, attorney Hebesha received an e-mail from the expert "wherein he indicated that … he needed 'to dismiss [himself] from expert witness consideration.'" The expert claimed "his schedule had 'booked up' and[,] given the short timeframe to get prepared for the January 2020 trial[,] he had no means of being able to do the work necessary to prepare for trial." Attorney Toole characterized this event as the expert's "unexpected withdrawal" from the case. "Thus, [he] was never formally designated and disclosed as Defendants' expert pursuant to [Code of Civil Procedure section 2034.210 et seq.]."

### Plaintiff's Evidence

Plaintiff's opposing evidence consisted of sworn declarations by attorney James Ware and the expert. The expert's declaration was attached as an exhibit to Ware's declaration. The expert's declaration was reportedly written "entirely on his own." Defendants made no objections to the evidence, so we again ignore any arguable hearsay issues.

Attorney Ware "came to identify [the expert] as a potential expert regarding damages" sometime "in August 2023," and "contacted him by telephone … [regarding plaintiff's] interest in his serving as an expert witness." Ambiguous wording makes it

6.

unclear whether the first telephone contact occurred in August 2023. According to plaintiff's opening brief on appeal, the initial phone interview did in fact occur in August 2023. This is noteworthy because of the expert's conflicting averment that he was "initially contacted" by Ware on September 16, 2023, and had "an initial telephone conference" with Ware "[o]n or about September 18, 2023."

Attorney Ware and the expert provided mostly consistent accounts of their first telephone call. Ware declared as follows:

"I described the dispute in general terms as a dispute over real property in Mariposa County. [The expert] said that he had a vague recollection that years ago he was contacted by a law firm, the name of which he did not recall, and discussed with a lawyer, whose name he also could not recall, whether the law firm might retain him as an expert witness in a case involving real property in Mariposa. [¶] I asked [the expert] to do a conflict's [*sic*] check so that we could determine if he had a conflict of interest. Over the telephone, I gave him the names of the parties in the case and the names of the law firms representing the parties."

The expert's declaration did not say he was told the names of any law firms or received instructions to perform a conflicts check. He recalled attorney Ware "gave the name of two entities and asked if I had any involvement in this case." When the expert replied no, Ware "further detailed the case, relative to the location (Mariposa, California) and [said] that it involved several hundred acres of potential development land and the essence of the case involved a partnership dispute." After hearing those details, the expert told Ware "it sounded slightly familiar and asked if [they] could have a follow through conversation on this the following day."

Attorney Ware and the expert talked again the next day (according to the expert) or possibly "a few days later" (according to Ware). Ware's account of their second telephone conference was as follows:

"[The expert] informed me that the Mariposa property involved in our case was the same property for which he had been interviewed. He stated that he had attended one meeting at a law office but could not recall the names

7.

of the lawyers or the substance of what was discussed. He stated that after the interview, and a brief exchange of correspondence (which he could not locate) he was told that the law firm had decided not to retain him. [The expert] told me that based on his recollection, he believed the decision to not retain him was an economic issue. [¶] Further, [the expert] said that he had no file or records with respect to the case, but that he would ask his firm to search its archives."

Attorney Ware claimed to have deduced, based on the circumstances, that defense counsel's law firm "must have been the firm that interviewed [the expert]." Accordingly, [o]ut of an abundance of caution," Ware's law partner, Mindy Ware, contacted attorney Hebesha by e-mail regarding plaintiff's "intent to disclose Mr. Smith as an expert witness." Some of these details, including the expert's alleged inability to recall "the names of the lawyers" or locate any "exchange of correspondence," conflict with both the e-mail from Mindy Ware to Hebesha on September 21, 2023, and the expert's own version of the events. As earlier noted, Mindy Ware said the expert had identified defense counsel's law firm. The expert's recollection of his second phone call with attorney James Ware, prior to Mindy Ware e-mailing Hebesha, was as follows:

"In that conversation, I discussed with him, I had been initially involved in consideration of serving as an expert and was initially contacted on December 18, 2018, by Ms. Hebesha. (At that time, we did an office search for any work file and found none; and I was only able to produce a series of electronic mails between Ms. Hebesha and myself from December 18, 2018 and January 19, 2019 (about a month's worth of correspondence)[)]. I explained to [James] Ware I did not recollect anything but a meeting and was never formally retained for the case. I told him I did not recollect anything about the case except the law firm involved, the fact it had to do with a partnership dispute and a few other small particulars, such as concern about payment by their client, about the possibility of appraising a couple of other properties besides the subject, etc. [James] Ware indicated he was going to disclose to the other firm they had intentions of retaining me and he felt, based on my never being formally retained, having no recollection at all about the nature of the case, etc., that I would be, in his opinion, a credible expert witness."

Attorney Ware's declaration next addressed the period between September 21, 2023 (when attorney Hebesha replied to Mindy Ware's e-mail), and October 16, 2023

(when plaintiff served defense counsel with its expert disclosures). Ware declared: "After receiving defense counsel's objection, I telephoned [the expert] to ask him whether[] he had been provided with confidential information or any written information at all. [The expert] confirmed that no such information was provided to him. [The expert] said that he had searched his files and had no record of being provided any such information. [¶] Subsequently, in reliance of [the expert]'s representation, we disclosed [the expert], believing that he was a neutral professional, who had been interviewed but had not received any confidential information from [defense counsel]."

The expert's declaration neither confirmed nor denied attorney Ware's statements regarding the period from September 21 to October 16, 2023. The expert made only one averment regarding that time frame: "I was later asked if I would forward a fee schedule and a CV/State of Professional Qualifications; and on October 3, 2023, [I] signed an agreement for my services for this matter." Due to ambiguous wording in both declarations, it is unclear whether Ware's statement about the expert denying he received "any written information at all" from defense counsel is contradicted by the expert's averment about locating, around the time of his second telephone call with Ware, "a month's worth of correspondence" with attorney Hebesha sent and received between December 2018 and January 2019.

For point of reference, defendants' motion was filed on October 24, 2023, in conjunction with an ex parte application for an order shortening time. Attorney Ware declared, "Prior to the Motion to Disqualify, I had one or two telephone calls with [the expert]. I explained to him that the case was set for a settlement conference in early November and as a cost saving measure, we would delay the commencement of his analysis until after that settlement conference. [The expert] asked me for the APN for the property. I provided the APN to him. To date, [the expert] has not provided any information to me." The expert did not confirm all of these details. He only declared, "I

9.

have provided my client, The Ware Practice Group, no work product as of this date [10/25/23]. (Either written, nor orally in telecommunication, conference, etc.)"

Attorney James Ware provided the expert with a copy of attorney Hebesha's declaration in support of the motion to disqualify. Ware's declaration and the expert's declaration provide separate accounts of what happened next. This is Ware's account:

"On October 24, 2023, at around 5:00 p.m., [the expert] telephoned me and said that after reading Ms. Hebesha's declaration, he ran a conflicts check on '[M.] Neal,' identified in Ms. Hebesha's declaration as an associate. [The expert] said that to his surprise, a conflicts check under the 'Neal' name produced documents and information that were different from those that came from his earlier conflicts check. I directed [the expert] to not tell me anything about what he now found. I asked [the expert] to send a sworn declaration to me that he had initially declared no conflict; that after Ms. Hebesha wrote that confidential information had been given to him, he denied that and reaffirmed no conflict of interest; and that after running the 'Neal' name different information was disclosed to him; and to confirm that he had provided no information to me."

The expert's declaration was not entirely corroborative, and it focused on different things. This is what the expert wrote:

"On October 24, 2023, I was sent the Declaration prepared and signed by Ms. Hebesha. In this document, I do not recollect the particulars and details she puts forth [in paragraphs] five, six, seven and eight. This made me question if I had the electronic mails she referenced. In this process (on October 24, 2023) I discovered my electronic mail service's search engine aggregated information on the 'sender' of the email, not just the person's name. In that, I discovered other emails which do, in fact, validate the factual information [in Hebesha's declaration] regarding dates, two meetings (not one as I recollected) and in fact, [defense attorney Toole's] introduction to me and attendance at this meeting. While this was an oversight on my part in my disclosure to my client, I have no recollection of the detail Ms. Hebesha puts forth and in this regard, question receiving, hearing or giving any opinion on alleged confidential information. If anything, in terms of 'work' I did it, again, would have been under the premise of still discussing issues like my function and role in the case, budget, report expectations, etc. I recollect concern about my budget and what their client (defendant[s]) may or may not want me to do in my role as an expert. As the months which expired will support, there was nothing l

10.

know of which had, at this juncture (2018–2019) validated my role as a retained expert for this case. It was preliminary thoughts and ideas which never resulted in my formal retention, nor detailed or confidential discussion of their legal approach to having this matter in trial."

Attorney Ware's declaration included a request for the trial court "to conduct an evidentiary hearing that includes an examination of [the expert]." This request was impliedly denied. The appellate record does not suggest the expert had any involvement in the motion proceedings beyond providing his declaration to plaintiff's counsel.

### Motion Hearing and Ruling

Attorney Hebesha argued the motion for defendants. Attorney James Ware argued on behalf of plaintiff. Hebesha openly accused plaintiff's counsel of deliberately attempting to obtain confidential information from the expert. Ware denied the accusation. Ware explained his reason for disregarding Hebesha's objections and moving forward with designating the expert was because he suspected Hebesha was misrepresenting the nature and extent of her earlier contact with the expert.

During his argument, Ware claimed the expert had mentioned being shown diagrams and maps in his prior meetings with defense counsel. In a rebuttal argument, Hebesha noted the absence of those details from both Ware's and the expert's declarations. The trial court later cited this as a point well taken, noting it "didn't see that in [the] declarations either."

The expert was impliedly found to have credibility issues in terms of his ability to accurately recall the events in question. The trial court explained, "I'm not saying he did it on purpose, but for whatever reason, he disclosed things in dribs and drabs and dribs and drabs. … And maybe his recollection is being refreshed as we go."

Defendants were found to have met their threshold burden under the *Shadow Traffic* framework. The trial court explained: "It's clear to me that, at some level, [defense counsel] did communicate confidential information to [the expert]. Whether he recalls all that or not, it's hard for me to discern that.… [¶] … But the clear facts is it's

11.

undisputed that information was given to him over the course of several hours. [*Sic.*] And whether he recalls it or not or had has [*sic*] a record of it or not, it happened. At least, that's this Court's belief." The expert was therefore disqualified from further participating in the case.[2]

On the issue of attorney disqualification, the trial court disapproved of how plaintiff's counsel responded after being put on notice of a possible conflict. Directing its remarks to attorney James Ware, the court said, "[I]t troubles me that you didn't, knowing that [defendants] objected to [plaintiff retaining the expert], seek guidance from the Court." This statement alluded to a discussion in *Shadow Traffic*, *supra*, 24 Cal.App.4th at page 1088 ["if [counsel] believed the objection unfounded, [it] could have fashioned an application to the trial court indicating its desire and the necessity for the services of [the expert]"].

The trial court continued: "And so I'm left with the issue of whether to disqualify your law firm. And so based on what I heard, I'm going to grant that motion, sir. I believe that there's enough information that has been imparted, and this is all about the integrity of the judicial system—not about individuals."

## DISCUSSION

### I. Standard of Review

"A trial court's decision to grant or deny a motion to disqualify counsel is generally reviewed for abuse of discretion. [Citations.] 'As to disputed factual issues, a reviewing court's role is simply to determine whether substantial evidence supports the trial court's findings of fact …. As to the trial court's conclusions of law, however,

---

[2]The trial court also disqualified the expert because of deficiencies in plaintiff's expert witness disclosures. In so ruling, the trial court agreed with an alternative argument that defendants had made based on Code of Civil Procedure section 2034.260, subdivision (c). (See *id*., § 2034.300.) Because plaintiff is not challenging the disqualification of the expert, we express no opinions about this aspect of the trial court's ruling.

12.

review is de novo; a disposition that rests on an error of law constitutes an abuse of discretion.'" (*Wu v. O'Gara Coach Co.*, *LLC* (2019) 38 Cal.App.5th 1069, 1079.)

The legal issue in this case is whether the trial court erred by applying *Shadow Traffic*'s burden-shifting framework. Plaintiff relies on two appellate court decisions that rejected the burden-shifting framework under certain factual circumstances. As such, the question of legal error is partially determined by the trial court's express and implied factual findings.

### A. Applicable Law

#### 1. *Shadow Traffic*

In the *Shadow Traffic* underlying action, Shadow Traffic Network, the defendant, was sued by a competitor, the plaintiff, for various business torts. The plaintiff's attorneys had a one-hour meeting with four representatives from the Deloitte & Touche accounting firm. They met "to discuss the possible retention of individuals from that firm as expert witnesses to testify in the upcoming trial." (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1071.) (We will refer to the representatives as experts 1, 2, 3, and 4.) A few days after the meeting, the plaintiff decided not to retain any of the experts. (*Id*. at p. 1072.)

Two weeks later, attorneys for the *Shadow Traffic* defendant contacted Deloitte & Touche and met with experts 1 and 4 "to discuss the hiring of an expert to testify on [the defendant's] behalf" at trial. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1072.) Expert 1 informed the defense lawyers about the prior contact with the plaintiff's counsel and of the plaintiff's decision not to retain them. The defense expressed no concerns about this, and expert 1 recommended they contact expert 2 and/or expert 3. (*Ibid*.) Defense counsel proceeded to contact expert 2, who was also upfront about his prior discussion of the case with the plaintiff's counsel. "After discussing the nature of [expert 2's] anticipated testimony, [defense counsel] agreed to hire [him]." (*Ibid*.) That same day,

the defense formally designated expert 2 as a retained expert on the issue of damages. "At no point did [defense counsel] contact [the plaintiff's counsel] about its prior meeting and discussion with Deloitte & Touche representatives." (*Ibid.*)

The *Shadow Traffic* plaintiff moved to disqualify defense counsel "on the basis that [they] had 'wrongfully gained access to [the plaintiff's] privileged and confidential communications, by means of improper contacts with [the plaintiff's] consultants at Deloitte & Touche.'" (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1072.) The plaintiff supported the motion with declarations from its attorneys. In those declarations, the plaintiff's counsel averred to having revealed confidential information during the in-person meeting with the Deloitte & Touche representatives and in preliminary telephone conversations with expert 1. (*Id.* at p. 1073.) The attorneys had shared their "basic theories of [the] case, and especially about the damages issues to be presented at trial." (*Ibid.*)

The *Shadow Traffic* defendant opposed the motion with a single declaration from the attorney who hired expert 2. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1074.) The lawyer admitted to having "talked briefly with [expert 2] regarding the case and the manner in which [the lawyer expected the plaintiff to] attempt to calculate its alleged damages." (*Ibid.*, italics omitted.) The attorney specifically declared that expert 2 "never told me anything about what he was told about the case by [the plaintiff's] lawyers, and I never asked him for such information." (*Id.* at p. 1075.)

The plaintiff's disqualification motion was granted, and a defense motion for reconsideration was denied. The motion for reconsideration was based on additional declarations by, inter alia, experts 1, 2, and 4. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at pp. 1075–1077.) Expert 1 averred to neither recalling nor believing she had received any confidential information from the plaintiff's counsel. (*Id.* at p. 1076.) Expert 1 further declared: "'[Defense counsel] did not inquire about, and I did not disclose, any of the substance of the meeting that I had with the [plaintiff's] attorneys.'" (*Ibid.*) Expert 4's

declaration "stated that she agreed 'entirely' with [expert 1's] recollection of the two meetings." (*Ibid.*) Expert 2's declaration "tracked that of [expert 1] in that he too" did not recall learning any confidential information from his meeting with the plaintiff's counsel. (*Id.* at pp. 1076–1077.) Expert 2 further declared: "'[Defense counsel] did not inquire about, and I did not disclose, any of the substance of the meeting that I had previously had with the attorneys [for the plaintiff].'" (*Id.* at p. 1077.)

The disqualification order was upheld by the Second District Court of Appeal, Division Four. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1071.) The appellate court explained "that communications made to a potential expert in a retention interview can be considered confidential and therefore subject to protection from subsequent disclosure even if the expert is not thereafter retained as long as there was a reasonable expectation of such confidentiality." (*Id.* at p. 1080.) Thus, the threshold issue was whether the plaintiff's counsel "did, in fact, engage in a confidential communication with Deloitte & Touche." (*Id.* at p. 1082.) Because the parties had submitted conflicting declarations to the trial court, the "implicit finding that [the plaintiff's counsel] imparted confidential information to Deloitte & Touche" was reviewed for substantial evidence. (*Id.* at p. 1084; see *id.* at pp. 1083–1084.) The finding was upheld based on the declarations of the plaintiff's counsel.

The next question, and an issue of first impression, was how to determine whether the Deloitte & Touche experts disclosed any of the plaintiff's confidential information to the defense attorneys. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1084.) The appellate court relied on *In re Complex Asbestos Litigation* (1991) 232 Cal.App.3d 572, which involved the analogous scenario of a nonlawyer employee (a paralegal) acquiring confidential case information while employed by a law firm.

> "'Absent written consent, the proper rule and its application for disqualification based on nonlawyer employee conflicts of interest should be as follows. The party seeking disqualification must show that its present or past attorney's former employee possesses confidential attorney-client

15.

information materially related to the proceedings before the court.… The party should not be required to disclose the actual information contended to be confidential. However, the court should be provided with the nature of the information and its material relationship to the proceeding. [Citation.] [¶] Once this showing has been made, a rebuttable presumption arises that the information has been used or disclosed in the current employment. The presumption is a rule by necessity because the party seeking disqualification will be at a loss to prove what is known by the adversary's attorneys and legal staff.'" (*Shadow Traffic*, *supra*, 24 Cal.App.4th at pp. 1084–1085, quoting *In re Complex Asbestos Litigation*, *supra*, 232 Cal.App.3d at p. 596.)

The rebuttable presumption of disclosure articulated in *In re Complex Asbestos Litigation* was held to apply in cases involving nonemployee experts. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1085.) The *Shadow Traffic* court observed that "the thrust of the [*In re Complex Asbestos Litigation*] opinion is to implement the important public policy of protecting against the disclosure of confidential information and the potential exploitation of such information by an adversary." (*Ibid.*) "As the purpose of this presumption is to implement the public policy of protecting confidential communications, the presumption is one affecting the burden of proof. [Citation.] The effect of this type of presumption 'is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact.'" (24 Cal.App.4th at p. 1085.) Therefore, "because the trial court had first found the basic fact that gave rise to the presumption ([the plaintiff's counsel] had given confidential information to Deloitte & Touche), it had to find the presumed fact (Deloitte & Touche had disclosed this confidential information to [defense counsel]) unless it was persuaded by a preponderance of the evidence of the nonexistence of the presumed fact." (*Ibid.*)

The appellate court went on to review the parties' evidence in light of the rebuttable presumption. Although defense counsel and the experts were consistent in their denials regarding the exchange of confidential information, those averments were not dispositive. "Even assuming that [defense counsel] did not expressly ask [expert 2] about the contents of his discussion with [the plaintiff's counsel] and that [expert 2] did

not explicitly disclose the information to [defense counsel], [defense counsel] could still obtain the benefit of the information because the data, consciously or unconsciously, could shape or affect the analysis and advice [expert 2] rendered to [the defendant]. Given that both [the plaintiff] and [the defendant] consulted [expert 2] on the same issue—[the plaintiff's] damages—it is highly unlikely that [expert 2] could conscientiously discharge his duty to [the defendant] as its retained expert and at the same time discharge his duty not to divulge confidential information received from [the plaintiff]." (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1086.)

It was noted "the trial court *could have* concluded that the presumption … was rebutted," but the evidence also supported its opposite conclusion. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at pp. 1086–1087, italics added.) "When a judicially created presumption affecting the burden of proof is triggered, the question of whether the party who has the burden of establishing the nonexistence of the presumed fact has carried its burden of persuasion is an issue for the trier of fact to decide, not a reviewing court." (*Id.* at p. 1087.) In other words, the reviewing court "may not reweigh the evidence or substitute [its] deductions for those of the trial court." (*Ibid.*)

### 2. *Collins v. State of California (2004) 121 Cal.App.4th 1112 (Collins)*

In *Collins*, the defendant entered into a formal consulting agreement with an expert, Dr. Clark, in August 1999. Defense counsel paid Dr. Clark a retainer fee and negotiated a confidentiality agreement. The documentation made clear Dr. Clark was being hired as a consultant and not as a "testifying expert." (*Collins*, *supra*, 121 Cal.App.4th at pp. 1117–1118.)

Approximately 13 months later, in September 2000, an attorney for the plaintiffs contacted Dr. Clark "about the possibility of retaining him as an expert witness." (*Collins*, *supra*, 121 Cal.App.4th at p. 1118.) "Dr. Clark agreed to be an expert witness for the [plaintiffs]," neglecting to disclose his consulting agreement with one of the

17.

defendants in the case.  (*Ibid*.)  Dr. Clark would later claim "that he had completely forgotten" about his commitment to the defense.  (*Id*. at p. 1119.)

In March 2002, defense counsel "'again spoke with [Dr.] Clark by telephone to ask his opinion regarding issues that had arisen in this case,'" and Dr. Clark  "'provided his expert opinions to [defense counsel] during that conversation.'"  (*Collins*, *supra*, 121 Cal.App.4th at p. 1118.)  Dr. Clark evidently failed to disclose his "dual retention" status, and both sides remained unaware of the problem.  (*Id*. at p. 1116; see *id*. at pp. 1118, 1122).  Three months later, plaintiffs' counsel "disclosed Dr. Clark as one of the 26 expert witnesses retained on behalf of the [plaintiffs]."  (*Id*. at p. 1119.)

The *Collins* defendant successfully moved to disqualify the plaintiffs' counsel based on the plaintiffs' retention of Dr. Clark.  In ruling for the defendant, "the trial court relied heavily on *Shadow Traffic*."  (*Collins*, *supra*, 121 Cal.App.4th at p. 1127.)  The disqualification order was reversed by the Third Appellate District.

On appeal, the plaintiffs argued "the *Shadow Traffic* rebuttable presumption should not apply … because [the defendant] retained access to the expert witness and they [the plaintiffs] could not ethically speak with the expert" after Dr. Clark's dual retention was discovered.  (*Collins*, *supra*, 121 Cal.App.4th at p. 1127.)  The appellate court agreed.  (*Id*. at pp. 1127–1129.)  The argument was based on *County of Los Angeles v. Superior Court* (1990) 222 Cal.App.3d 647, which holds that if one party has an ongoing consulting relationship with an expert not designated as an expert witness, "the opposing party is barred from communicating with the expert and from retaining him or her as the opposing party's expert."  (*County of Los Angeles*, at pp. 657–658.)

The *Collins* opinion holds that "where the expert has remained under the control of the moving party, and there is no evidence counsel knowingly retained the opposing party's expert or that the expert intentionally advised both sides, the *Shadow Traffic* rebuttable presumption does not apply."  (*Collins*, *supra*, 121 Cal.App.4th at p. 1129.)  The holding is based on "the particular facts" of the case, including "the fact that the

18.

expert witness …, Dr. Clark, remained the consultant to [the defendant]." (*Id*. at p. 1128.) The appellate court expressed "no opinion as to whether the burden of proof should shift where the expert is no longer communicating with the party that originally retained him." (*Id.* at p. 1129, fn. 9.)

The appellate court's rejection of the *Shadow Traffic* framework was driven by its conclusion that when the plaintiffs' counsel "discovered that [he] had inadvertently retained the same expert, [he] was duty bound to refrain from talking directly with that expert until the court resolved the problem." (*Collins*, *supra*, 121 Cal.App.4th at p. 1132.) The plaintiffs' counsel "did exactly that" (*ibid.*) by immediately terminating all communication with Dr. Clark (*id*. at pp. 1116, 1121–1122). Consequently, the plaintiffs were unable to obtain a declaration from the expert to support an opposition to the defense motion. "The most important source of the information from which to ascertain whether Dr. Clark had passed on any confidential information to [the plaintiffs' counsel] thus remained in [the defendant's] hands."[3] (*Collins*, at p. 1129.)

The *Collins* court ultimately reversed the disqualification order for several reasons. Because the defendant's evidence addressed only the communications between Dr. Clark and defense counsel, it was held insufficient to show Dr. Clark had shared the defendant's confidential information with the plaintiffs' counsel. (*Collins*, *supra*, 121 Cal.App.4th at p. 1130.) "Importantly, [the plaintiffs' counsel] swore under penalty of perjury that Dr. Clark had not disclosed anything to him that constituted confidential

[3]After the trial court granted the motion, the disqualified counsel attempted "to secure Dr. Clark's deposition" to obtain supporting evidence for a motion for reconsideration. (*Collins*, *supra*, 121 Cal.App.4th at p. 1121.) The appellate court opined such efforts were ethically permissible at that point. (*Id*. at p. 1130, fn. 10.) Dr. Clark retained his own lawyer and refused to be deposed. He later independently prepared and submitted a declaration to the trial court while the motion for reconsideration was pending. (*Id*. at pp. 1121–1122 & fn. 7.) "The trial court denied the motion for reconsideration, concluding that [the plaintiffs] had not produced any new facts to justify reconsideration." (*Id*. at p. 1122.) The appellate court found this conclusion to be erroneous. (*Id*. at p. 1130, fn. 10.)

information from [the defendant's] counsel. … [This] testimony was independently confirmed by Dr. Clark. Dr. Clark declared, essentially, that he forgot he had spoken with anyone else about this case and therefore he could not have disclosed any information to [the plaintiffs' counsel] about what he learned from the other side." (*Ibid*.)

Notably absent from the analysis was any discussion of whether the trial court had made express or implied credibility findings. However, the opinion intimates the outcome would have been the same regardless of whether there was substantial evidence of disclosure from the expert to the plaintiffs' counsel. The appellate court cited *State Comp. Ins. Fund v. WPS*, *Inc.* (1999) 70 Cal.App.4th 644 for the principle that "'"[m]ere exposure to the confidences of an adversary does not, standing alone, warrant disqualification."'" (*Collins*, *supra*, 121 Cal.App.4th at p. 1131, quoting *State Comp. Ins. Fund*, at p. 657.)

The *Collins* court made clear its decision was equally based on the fact the plaintiffs' counsel "was innocent of wrongdoing when it hired Dr. Clark and acted ethically after this issue was discovered." (*Collins*, *supra*, 121 Cal.App.4th at p. 1131.) A third reason for reversal was the plaintiffs' likely inability to obtain replacement counsel. (See *id*. at pp. 1123–1124, 1132 [concluding the main plaintiff's "'important right to counsel of [his] choice' should not have been taken from him"].) "This … was supported by [the plaintiffs' counsel's] declaration that his firm had spent between $300,000 and $500,000 in out-of-pocket costs on this case and would assert a lien against the case for $1.5 million if it was recused. … It was [counsel's] opinion that no other attorney would take this case given its complexity and the enormous attorney fee lien the [disqualified] firm would assert against the case." (*Id*. at p. 1120, fn. 5.)

### 3. *Shandralina G. v. Homonchuk (2007) 147 Cal.App.4th 395 (Shandralina G.)*

The *Shandralina G.* defendant hired an expert, Dr. Landers, who "agreed to act as a defense consultant." (*Shandralina G.*, *supra*, 147 Cal.App.4th at p. 401.) Five months

later, an attorney for the plaintiff contacted Dr. Landers about serving as a retained expert witness. (*Ibid.*) Like the expert in *Collins*, Dr. Landers failed to realize he had already been hired as a consultant by the opposing party. Dr. Landers did not disclose the conflict, and the plaintiff's counsel innocently designated him as a retained expert. (*Id.* at pp. 401–402.)

Relying on *Shadow Traffic*, the defendant moved to disqualify the expert and the plaintiff's counsel. (*Shandralina G.*, *supra*, 147 Cal.App.4th at pp. 400, 403.) The plaintiff argued for the *Collins* exception because, among other reasons, "[Dr.] Landers remained under [the defendant's] control." (*Shandralina G.*, at p. 403.) The evidence presented a factual dispute as to whether the consulting relationship between the defendant and Dr. Landers had ended. (*Id.* at pp. 402–404 & fn. 3.) The trial court "was not persuaded there was a 'continued relationship between Landers and defense counsel' and therefore held that '[t]he rationale of *Collins* … [was] inapplicable.'" (*Id.* at p. 412; see *Collins*, *supra*, 121 Cal.App.4th at p. 1129 ["At all times, the expert witness … remained a consultant" for the party seeking disqualification].) The trial court thus applied the *Shadow Traffic* framework and ultimately granted the disqualification motion. (*Shandralina G.*, at pp. 404–405, 412.)

The disqualification order was reversed by the Fourth District Court of Appeal, Division One. The opinion states, "We are convinced, under the facts of this case, it was error to apply *Shadow Traffic*'s burden-shifting presumption because there was no legal impediment to [the defendant's] ability to obtain evidence from [Dr.] Landers on the content of the conversation to satisfy the burden of proof." (*Shandralina G.*, *supra*, 147 Cal.App.4th at p. 412.) The problem with this statement is the implication that the party seeking disqualification in *Shadow Traffic* was unable to communicate with the Deloitte & Touche experts before or during the pendency of its motion.

The *Shadow Traffic* opinion explains that Deloitte & Touche terminated its relationship with all of the litigants before the disqualification motion was filed. The

21.

moving party "did *not* seek disqualification of Deloitte & Touche as [the opposing party's] expert witness because, by that time, Deloitte & Touche had agreed to withdraw from the case." (*Shadow Traffic*, *supra*, 24 Cal.App.4th at pp. 1072–1073.) The opinion does not suggest there was any legal impediment to either party contacting the experts for purposes of litigating the disqualification motion. In fact, an attorney for the moving party *did* contact one of the experts and relied on the substance of that conversation to support the motion. (*Id.* at p. 1074.) The nonmoving party could have sought declarations from the experts to support its initial opposition, but it did not. (See *id.* at p. 1075 ["Markedly absent from Shadow's opposition papers were declarations from any Deloitte & Touche personnel"].)

The appellate court in *Shandralina G.* ostensibly viewed *Shadow Traffic* as distinguishable, rather than wrongly decided, and its decision was "based on the same rationale applied in *Collins* …." (*Shandralina G.*, *supra*, 147 Cal.App.4th at p. 414.) Despite statements about the expert remaining available to the *moving* party, what actually distinguishes *Shandralina G.* from *Shadow Traffic* and brings the case within the *Collins* exception is a restriction placed upon the nonmoving party before the disqualification motion was even filed. Prior to filing its motion, the *Shandralina G.* defendant made an ex parte request for an order shortening time. In granting the request, the trial court also "ordered [the plaintiff's] counsel not to have contact with any experts." (*Shandralina G.*, at p. 403.) When the plaintiff filed her opposition, she argued for the *Collins* exception because, inter alia, her counsel "was barred by court order from contacting [Dr.] Landers and therefore could not produce a declaration from [Dr.] Landers verifying the absence of improper communications." (*Shandralina G.*, at p. 404.)

To summarize, the expert in *Collins* was legally unavailable to the nonmoving party because of the rule prohibiting communication with a nondesignated expert who has an ongoing consulting relationship with the opposing party. (See *County of Los*

22.

*Angeles v. Superior Court, supra*, 222 Cal.App.3d at pp. 650, 657–658.) In *Shandralina G.*, the trial court found the consulting relationship between the expert and the moving party had ended and the element of "control" over the expert was missing. (*Shandralina G., supra*, 147 Cal.App.4th at pp. 404–405, 412 & fn. 14.) But the expert was unavailable to the nonmoving party for a different reason, i.e., the order prohibiting the plaintiff's counsel from having "contact with any experts." (*Id*. at p. 403.) The appellate court reasoned it was "paradoxical that the [trial] court (by applying the *Shadow Traffic* presumption) mandated that [the plaintiff] prove what [Dr.] Landers said, while barring [the plaintiff] from contacting '[t]he most important source of the information from which to ascertain whether [the expert] had passed on any confidential information.'" (*Shandralina G.*, at p. 413, fn. 15, quoting *Collins, supra*, 121 Cal.App.4th at p. 1129.)

Properly viewed, *Shandralina G*. merely extends the *Collin*s exception to other circumstances in which the expert is legally unavailable to the *nonmoving party*. In short, a trial court abuses its discretion by applying *Shadow Traffic's* rebuttable presumption while simultaneously restricting the nonmoving party's ability to rebut the presumption.

### B.      Analysis

#### 1.      *Defendants Met Their Initial Burden*

The trial court found that confidential information was revealed to the expert by defendants' attorneys. This finding is reviewed for substantial evidence. (*Shadow Traffic, supra*, 24 Cal.App.4th at pp. 1083–1084; see *Collins, supra*, 121 Cal.App.4th at p. 1128.) Plaintiff does not challenge the finding in its briefing, so the issue warrants little discussion.

In her declaration, attorney Hebesha declared she and the expert discussed "the fact that he understood that [she and other attorneys in her firm] would be relaying to him confidential information." Hebesha further declared, as did attorney Toole, that the expert received confidential information in the form of their trial strategy and "theories

23.

and views" regarding various claims and defenses over the course of two 90-minute meetings. Defense counsel also declared the expert "fully participated in the discussion, and offered several suggestions and comments on our trial strategy."

The averments of defense counsel closely tracked certain evidence held sufficient in *Shadow Traffic*—perhaps even a little too closely. (See *Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1073 [moving party's attorney declared, "'The Deloitte & Touche representatives fully participated in the discussion, and indeed offered several suggestions and comments on our strategy"].) In any event, the averments regarding the expectation of confidentiality were uncontroverted, and the evidence of confidential disclosures was sufficient despite any arguably conflicting statements in the expert's declaration. (*Id*. at p. 1083; see *Collins*, *supra*, 121 Cal.App.4th at pp. 1127–1128; *Western Digital Corp. v. Superior Court* (1998) 60 Cal.App.4th 1471, 1481.)

### 2. *The Trial Court Properly Applied the* **Shadow Traffic** *Framework*

Under *Shadow Traffic*, defense counsel's sharing of confidential information with the expert triggered a rebuttable presumption that the expert disclosed such information to the plaintiff's counsel. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1085.) The trial court followed *Shadow Traffic* and applied the rebuttable presumption. Plaintiff argues the facts warranted application of the *Collins* exception because the expert's consulting relationship with defense counsel was never terminated.

Plaintiff erroneously contends that during the motion hearing, "the trial court stated that he regarded [the expert] as having an on-going relationship with [defendants]." The argument is supposedly based on a remark by the trial court about "a retained expert who is switching sides." Plaintiff quotes this language out of context at pages 7 and 35 of its opening brief, and again at page 7 of the reply brief.

This is what the trial court said:

> "So it's clear to me—I disagree, Mr. Ware, when you say that the—I keep losing it—that the *Shadow Traffic* case does not square with this, because it

looks like it's pretty close. We have got an expert. Yes, that expert was retained, but—[¶] And you talked about—you know, talking about people from law firms. But the Court used that as an analogy. But the Court did look at you have got a retained expert who is switching sides, so to speak, and how do you deal with that?"

Earlier in the hearing, plaintiff's attorney James Ware discussed *Shadow Traffic* and the *Shadow Traffic* court's reliance upon *In re Complex Asbestos Litigation*, *supra*, 232 Cal.App.3d 572. Ware did not cite either case by name, but he referenced the law firm that was disqualified in *Shadow Traffic* (Latham & Watkins), thus making it clear which case he was talking about. Ware described *Shadow Traffic* as "a case where the standard is drawn from cases where a person, who has worked for a long term for a firm, joins an opposition firm." He was plainly alluding to *Shadow Traffic*'s discussion of *In re Complex Asbestos Litigation*. (See *Shadow Traffic*, *supra*, 24 Cal.App.4th at pp. 1084–1085.)

When the trial court spoke to attorney Ware and said, "you talked about … people from law firms," it was in reference to Ware's prior discussion of *Shadow Traffic*. The subsequent comment, "[T]he Court did look at you have got a retained expert who is switching sides …," was in reference to the *Shadow Traffic* court. The brief synopsis of *Shadow Traffic* was not entirely accurate, since none of the experts in *Shadow Traffic* were ever retained by the moving party, but the mistake is immaterial. What matters is those statements are not reasonably construed as a finding of an ongoing consulting relationship between the expert and defense counsel, vis-à-vis this case, during the relevant time period in 2023. Even if they could be so construed, "ambiguities are resolved in favor of affirmance." (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 631.)

Plaintiff also relies on a strained interpretation of language in the declarations of attorney Hebesha and the expert. Hebesha declared, "[The expert] has been utilized as a consultant and expert by my firm on many occasions, which is how I came to know of

25.

him." The expert, Rick Smith, declared, "I have enjoyed years of working with the multiple attorneys at Wanger Jones Helsley [i.e., Hebesha's law firm] and hope to continue to …." According to plaintiff, these statements are indicative of "the continuing nature of [the expert]'s relationship with [defense counsel's law firm] as a consultant" at the time of the disqualification motion.

Plaintiff's arguments disregard several principles of appellate review. "'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) This means we imply all findings necessary to support the disqualification order, "and our review is limited to whether there is substantial evidence in the record to support these implied findings." (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 928; accord, *Hall v. Municipal Court* (1974) 10 Cal.3d 641, 643.) Any competing inferences permitted by the evidence are resolved in favor of the implied findings. (See *In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598; *County of Kern v. Jadwin* (2011) 197 Cal.App.4th 65, 73 ["A factual finding based upon the drawing of an inference is to be upheld on appeal"].)

Furthermore, trial courts are "presumed to know and understand the applicable law." (*Cardinal Health 301*, *Inc. v. Tyco Electronics Corp*. (2008) 169 Cal.App.4th 116, 155.) Defendants' motion papers cited and distinguished *Collins*. Plaintiff's opposition brief also cited *Collins*. At the motion hearing, the trial court stated it had "read and considered the motion, the response, and the reply." We therefore presume the court was familiar with the *Collins* exception and the circumstances under which it applies. The trial court found *Shadow Traffic* to be the governing authority, which necessarily implies it found the expert did not have an ongoing relationship with defendants, on a consulting basis or otherwise, during the relevant time period.

According to the declaration of attorney Hebesha, the expert informed defendants, in November 2019, "that he needed 'to dismiss [himself] from expert witness consideration.'" The declaration of attorney Toole indicates defense counsel viewed this as "[the expert]'s unexpected withdrawal as our consulting expert." According to the expert's declaration, he "was never formally retained for the case." He emphasized, "I never and have never considered myself engaged for the assignment and entirely dismissed myself for such formal engagement or involvement (as noted by Ms. Hebesha, on or about November 11, 2019)." Discrepancies in these averments are inconsequential because the trier of fact may believe some of a witness's testimony and disbelieve other parts. (*In re Lopez* (2023) 14 Cal.5th 562, 591.) The evidence was amply sufficient to show that whatever relationship may have existed between defendants and the expert, it ended years prior to the expert's contacts with plaintiff's counsel.

The facts are distinguishable from *Collins* in several ways, including the lack of an ongoing consulting relationship between defendants and the expert. (See *Collins*, *supra*, 121 Cal.App.4th at p. 1129 ["At all times, the expert witness … remained a consultant" for the party seeking disqualification].) Plaintiff's continued access to the expert further distinguishes this case from both *Collins* and *Shandralina G.* Regardless of whether plaintiff's counsel should have refrained from communicating with the expert, they chose to maintain contact with him even after the disqualification motion was filed. And, unlike the nonmoving parties in *Collins* and *Shandralina G.*, plaintiff obtained a declaration from the expert to support its opposition to the motion.

Plaintiff argues the "ethical conduct of [its] counsel" weighs in favor of applying the *Collins* exception. While it is true the conduct of counsel was a significant factor in *Collins*, the present dispute was not handled in accordance with the guidelines provided in *Shadow Traffic* or *Collins*. Upon learning of a potential conflict, plaintiff's counsel responded appropriately by contacting defendants' counsel. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1088.) But when attorney Hebesha objected to plaintiff's proposed

retention of Rick Smith and claimed he possessed confidential information, the proper response was *not* to assume Hebesha was lying or exaggerating and thus proceed with designating Rick Smith as plaintiff's retained expert.

"[I]f it believed the objection unfounded, [plaintiff] could have fashioned an application to the trial court indicating its desire [to retain the expert and/or] the necessity [of the expert's] services." (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1088.) Another option would have been to engage in further dialogue with defense counsel. After receiving defendants' objection and being warned of the expert's conflict, plaintiff's counsel waited six days before sending a curt reply ("We acknowledge your response"). Another 19 days passed before plaintiff notified defendants that it had retained Rick Smith as an expert.

In both *Collins* and *Shandralina G.*, the attorneys facing disqualification were unaware of a potential conflict when they retained their experts. (*Shandralina G.*, *supra*, 147 Cal.App.4th at p. 399; *Collins*, *supra*, 121 Cal.App.4th at p. 1131.) Despite this distinction, plaintiff focuses on what its attorneys knew before versus after the filing of defendants' motion. Plaintiff emphasizes its counsel was unaware of the "consulting relationship" between defendants and the expert prior to being served with the motion and reading attorney Hebesha's declaration. Plaintiff seemingly commends its attorneys for having "immediately contacted [the expert] for clarification" about Hebesha's averments. But under *Collins*, if plaintiff's counsel truly believed Hebesha was declaring the existence of an ongoing consulting relationship with the expert, counsel "was duty bound to refrain from talking directly with that expert until the court resolved the problem." (*Collins*, at p. 1132.)

"Disqualification motions implicate competing considerations. On the one hand, these include clients' rights to be represented by their preferred counsel and deterring costly and time-consuming gamesmanship by the other side. '[T]he client has an interest in competent representation by an attorney of his or her choice [citations] and perhaps,

the interest in avoiding inconvenience and duplicative expense in replacing counsel already thoroughly familiar with the case.'" (*Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 911.) On the other hand is the "'paramount concern'" of preserving "'public trust in the scrupulous administration of justice and the integrity of the bar.'" (*Collins*, *supra*, 121 Cal.App.4th at p. 1124.) Plaintiff's opening brief describes the now-disqualified attorneys as being "new counsel in the case" when the dispute over the expert arose. Unlike in *Collins*, plaintiff did not submit evidence of any particular hardships it would face by having to find replacement counsel. (*Id.* at p. 1120 & fn. 5.)

Like the trial court, we conclude the facts of this case are most analogous to those in *Shadow Traffic*. Plaintiff fails to demonstrate error regarding the application of *Shadow Traffic*'s burden-shifting framework.

### 3. The Trial Court Permissibly Found the Presumption of Disclosure Was Not Rebutted

Plaintiff had the burden of showing, by a preponderance of the evidence, that the expert did not disclose any of defendants' confidential information to plaintiff's counsel. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1085.)

"In a case where the trier of fact has determined that the party with the burden of proof did not carry its burden and that party appeals, 'it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the [challenged ruling].'" (*Ajaxo*, *Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163.) "Specifically, we ask 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" (*Id.* at pp. 163–164.) "This is 'an onerous standard' [citation] and one that is 'almost impossible' for a losing plaintiff to meet, because unless the trier of fact made specific factual findings in favor of the losing plaintiff, we presume the trier of fact concluded that 'plaintiff's evidence lacks sufficient

29.

weight and credibility to carry the burden of proof.'" (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651, quoting *Ajaxo, Inc.*, *supra*, at p. 164 & *Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.)

In its reply brief, plaintiff attempts to frame the issue in terms of whether it presented some evidence to rebut the presumption of disclosure. Plaintiff begins by quoting the trial court out of context, then argues the court erroneously found it did not submit any probative evidence. Plaintiff devotes the rest of its reply brief to arguing the nonexistent issue of whether the declarations of attorney James Ware and the expert had any probative value.

Plaintiff quotes the trial court as having said, in relation to whether the expert disclosed confidential information to plaintiff's counsel, "I don't hear anything that rebuts that presumption." The quoted statement was actually made in the context of deciding whether defendants met their initial burden to show the expert received confidential information from defense counsel:

> "So in this case, I considered everything that everybody said, everything that everybody has filed. It's clear to me that, at some level, the attorneys for the Opinski Defendants did communicate confidential information to [the expert]. Whether he recalls all that or not, it's hard for me to discern that. Five years is five years. If he's a busy expert, he's probably talking to lots of people.
>
> "And the fact that his filing system was under somebody else's name, so be it. But the clear facts is it's undisputed that information was given to him over the course of several hours. [*Sic*.] And whether he recalls it or not or had has [*sic*] a record of it or not, it happened. At least, that's this Court's belief. And based on that, that creates the rebuttal [*sic*] presumption that he had confidential information, and that, you know, that certainly could have been disclosed. I don't hear anything that rebuts that presumption. [¶] And so I'm going to grant the motion to disqualify [the expert]."

It appears the trial court misspoke, since there is no rebuttable presumption regarding the moving party's disclosure of confidential information to an expert who was

later retained by the nonmoving party. (*Shadow Traffic*, *supra*, 24 Cal.App.4th at pp. 1082–1084; see *Toyota Motor Sales*, *U.S.A.*, *Inc. v. Superior Court* (1996) 46 Cal.App.4th 778, 782 ["*If* … a former consultant or employee is shown to have possessed confidential information material to the pending litigation, a *rebuttable* presumption arises that the consultant has disclosed such information to present counsel"].)  But even assuming the trial court was referring to disclosure by the expert to plaintiff's counsel, stating "I don't hear anything that rebuts that presumption," it is not the same as finding plaintiff failed to submit any evidence on the issue.  As previously discussed, "ambiguities are resolved in favor of affirmance." (*Winograd v. American Broadcasting Co.*, *supra*, 68 Cal.App.4th at p. 631.)

Later in the hearing, while discussing whether plaintiff's counsel should be disqualified, the trial court said, "I believe that there's information that has been imparted, and this is all about the integrity of the judicial system—not about individuals." Considering the ultimate disqualification ruling, we construe the language about information having "been imparted" as a finding the presumption of disclosure by the expert to plaintiff's counsel was not rebutted.  The trial court's statement about "the integrity of the judicial system" appears related to arguments made in defendants' moving papers.  Defendants used the exact same phrase, and multiple variations of it, throughout their briefing.[4]

---

[4]Defendants paraphrased the following statement in *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems*, *Inc.* (1999) 20 Cal.4th 1135:  "The paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." (*Id*. at p. 1145.)  This language was also quoted in *Collins*, including in the penultimate sentence where the appellate court stated, "There is nothing in this record that demonstrates that recusal is necessary to 'preserve public trust in the scrupulous administration of justice and integrity of the bar.'" (*Collins*, *supra*, 121 Cal.App.4th at p. 1132.)  It is possible the trial court was impliedly contrasting the circumstances of this case with those in *Collins*.

The declarations of the expert and attorney Ware closely resemble, in substance, the declarations filed by the nonmoving party in *Shadow Traffic*. The attorney declared the expert "'never told me anything about what he was told about the case by [opposing counsel,] and I never asked him for such information.'" (*Shadow Traffic*, *supra*, 24 Cal.App.4th at p. 1075.) The expert declared, "'[The attorney] did not inquire about, and I did not disclose, any of the substance of the meeting that I had previously had with [opposing counsel].'" (*Id*. at p. 1077.) Such declarations do not rebut the presumption as a matter of law. The trial court may conclude the evidence lacks sufficient weight, which does not necessarily mean it suspects the declarants are lying. "Even assuming [the attorney] did not expressly ask [the expert] about the contents of his discussion with [opposing counsel,] and that [the expert] did not explicitly disclose the information to [the attorney], [the attorney] could still obtain the benefit of the information because the data, consciously or unconsciously, could shape or affect the analysis and advice [the expert] rendered to [the nonmoving party]." (*Id*. at p. 1086.)

The expert's admitted "oversight" in failing to initially disclose all relevant information about a potential conflict demonstrates the fallibility of human memory. The trial court may have also been persuaded by the following argument in defendants' motion:

> "[Plaintiff's counsel] disclosed Mr. Smith as an expert to give opinions on breaches and damages and, thus, had to have had more than 'general' discussions in order to do so. It is inconceivable that Plaintiff's counsel and [Rick Smith] would not discuss the case in enough detail to be able for him to agree to act as an expert and articulate his opinions for them."

In other words, defendants argued plaintiff would not have identified Rick Smith as a retained expert in plaintiff's expert witness disclosures unless plaintiff's attorneys were confident that he would provide favorable opinion testimony. Such expectations would imply plaintiff's counsel and the expert had substantive discussions about the case. These are reasonable inferences.

32.

The same kind of inferences were rejected in *Shandralina G.*, but under materially distinguishable circumstances. First, the appellate court had determined the rebuttable presumption did not apply and was therefore analyzing the moving party's failure to affirmatively prove the expert's disclosure of information to the nonmoving party. (*Shandralina G.*, *supra*, 147 Cal.App.4th at pp. 414–416.) Second, the nonmoving party presented evidence explaining "why he designated [the expert] despite the absence of any substantive discussions: the time deadline for designation was about to expire." (*Id.* at p. 416.) There is no similar evidence in this case. Plaintiff's own evidence indicates its attorneys began speaking with the expert at least one month prior to serving its expert witness disclosures.

The appellate court in *Shandralina G.* also failed to address the trial court's ability to make express and implied credibility findings. "All issues of credibility are … within the province of the trier of fact." (*Nestle v. Santa Monica* (1972) 6 Cal.3d 920, 925.) "[T]he trier of fact is not required to believe the testimony of any witness, even if uncontradicted," and "[w]e have no power on appeal to judge the credibility of witnesses or to reweigh the evidence." (*Bookout v. State of California ex rel. Dept. of Transportation*, *supra*, 186 Cal.App.4th at pp. 1487, 1486.) The trial court's credibility determinations do not require live testimony; they can be based on written declarations. (See *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479; *Toyota Motor Sales*, *U.S.A.*, *Inc. v. Superior Court*, *supra*, 46 Cal.App.4th at p. 783.)

In summary, when a trial court sits as the trier of fact, "it is called upon to determine that a witness is to be believed or not believed. This is the nature of factfinding." (*In re Marriage of Greenberg* (2011) 194 Cal.App.4th 1095, 1099.) "It is not our role to 'reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses.'" (*Keys v. Alta Bates Summit Medical Center* (2015) 235 Cal.App.4th 484, 488.) As in *Shadow Traffic*, "[t]he record before us and our analysis of the declarations do not compel the conclusion that the trial judge exceeded the bounds of

reason by implicitly concluding that [the plaintiff] had failed to carry its burden ….
Thus, the presumption of disclosure remained unrebutted." (*Shadow Traffic*, *supra*, 24
Cal.App.4th at p. 1087.)  Plaintiff has likewise failed to meet its appellate burden of
demonstrating reversible error.

## DISPOSITION

The challenged order is affirmed.  Defendants shall recover their costs on appeal.


PEÑA, J.

WE CONCUR:


LEVY, Acting P. J.


SMITH, J.